## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DENISE SZUSTOWICZ,      :     CIVIL ACTION
      Plaintiff,       :
                    :
   v.              :
                    :     NO: 08-cv-04745
                    :
CITY OF PHILADELPHIA,    :
      Defendant.

## MEMORANDUM

On October 14, 2015, after a six-day trial, the jury returned a verdict of $265,000 in favor of Denise Szustowicz, the plaintiff, and against the City of Philadelphia, the defendant. Before me are post-trial motions filed by the City, in the alternative, seeking judgment as a matter of law, a new trial, entry of a nominal damages award of one dollar, or a remittitur. *See* Doc. No. 213. The City also has filed a motion regarding allegations of juror misconduct based on an alleged misstatement made by a member of the jury during the voir dire process. *See* Doc. No. 172. Plaintiff Denise Szustowicz opposes the City's motions. Doc. No. 216. She has filed motions seeking to dismiss the City's motions. Doc. Nos. 202, 214. After careful review of the record and the briefing, I conclude that all motions should be denied.

## I.    Factual and Procedural Background

I view the facts in the light most favorable to Szustowicz, giving her the "advantage of every fair and reasonable inference[.]" *Warren v. Reading Sch. Dist.*, 278 F.3d 163, 168 (3d Cir. 2002) .

In October of 2006, Detective Miguel Alers, an Hispanic male, worked in the City of Philadelphia Police Department's (PPD) Central Detectives Unit. Trial Transcript

1

10/6/2015 9:33 A.M. at 24-25 (T.T. 10/6 (Doc. No. 195) at 24-25).[1] Alers, who stood

about 5'4" or 5'5", told Szustowicz he had been subject to a number of "jokes" by other

detectives in his squad, including raising his desk on milk crates, moving his coat hook

higher up on an office wall, elevating his desk chair on a stack of phone books, and

gluing various items to his desk. *Id.* at 25. The most "horrendous" of the jokes, from

Szustowicz's perspective, was that the other detectives took Alers' gun. *Id.* at 26. Alers

appeared upset and "completely distraught." *Id.* Alers believed the other detectives

were going to accuse him of losing his gun. *Id.* Szustowicz believed someone was out to

set up Alers, and that the event should have been treated as a crime scene. *Id.*

Szustowicz told Alers to call internal affairs and report this event, as well as notify the

Equal Employment Opportunity unit within the police department, and the "federal

EEO" [sic]. *Id.* at 27. Szustowicz thought the "jokes" were racially motivated because

Alers was short and Puerto Rican. *Id.* at 28. She believed based on her training with the

police department that it was appropriate to file an EEO complaint. *Id.* at 28-29. Alers

filed an EEO charge in 2006. *Id.* at 29.

About two weeks after Alers and Szustowicz spoke, Lieutenant Brown and

Captain Seaborough, Szustowicz's commanding officers, changed Szustowicz's work

assignment. *Id.* at 30, 35. Szustowicz later identified the assignment switch as having

happened November 19, 2006. *Id.* at 57. Szustowicz had been partners with Detective

---

[1] Because of travails in preparing the transcript, multiple transcripts exist from the same day. I have used the docket numbers to keep the transcripts straight.

Castro, but was reassigned to work with Officer Bond. *Id.* at 31.[2] Szustowicz had complained to Lieutenant Brown many times about Officer Bond. "He was never there. . . we were supposed to start at 2, he would come in at 4. He worked for major league baseball . . . he would leave for like three hours, four hours to go to the [Phillies] ball game." *Id.* at 31-32. Sometimes Bond took a police car, and left Szustowicz at work with no car. *Id.* at 32. Szustowicz told Captain Seaborough she would prefer not to work with Bond because "I need somebody that's gonna back me up." *Id.* Then Szustowicz was told she would have to serve warrants with Bond. *Id.* This posed a problem, because "it's very dangerous serving warrants. I mean, that's where we get hurt the most. . . I'm not comfortable serving a warrant with somebody I know that doesn't like me." *Id.* at 32-33. Before the switch it was customary to serve warrants with four officers. *Id.* at 33. After the switch, Lieutenant Brown ordered Szustowicz to serve a warrant with only Officer Bond. *Id.* Lt. Brown reported to Cpt. Seaborough. *Id.* at 34. Cpt. Seaborough testified she had no complaints from any detectives saying they would not work with Szustowicz. T.T. 10/7 (Doc. No. 197) at 18. Cpt. Seaborough reassigned Szustowicz to another job under Seaborough's command as a result of Szustowicz' refusal to serve a warrant with Bond. *Id.* at 22-23.

  Between the time Alers and Szustowicz spoke, Alers warned Szustowicz that they had been seen talking and that "they were out to get me." T.T. 10/6 (Doc. No. 195) at 35. Alers relayed to Szustowicz that someone told Alers that the captain [Seaborough]

---

[2] Bond is variously referred to as both Bond and Bonds in the transcript. I have elected to refer only to "Bond."

"mentioned that she had observed me speaking to him and did not like it." *Id.* at 48-49.[3]
Szustowicz and Alers were talking together at one point about Alers' situation when Sgt.
Jones happened upon them. *Id.* at 42. Alers was reassigned to another unit under
Seaborough's command in November. *Id.* at 42.

Once her assignment switch happened, Szustowicz never saw Bond. "I was by
myself." *Id.* Szustowicz objected to Cpt. Seaborough and Lt. Brown that switching her to
work with Officer Bond amounted to creating a hostile work environment. *Id.* at 49.
Szustowicz said the same thing to Sgt. Jones. *Id.* at 50. At one point Szustowicz arranged
to have several detectives with her to serve warrants and the plan was countermanded
by Lt. Brown, who told her she would only serve warrants with Officer Bond. *Id.* at 51.
Szustowicz told Lt. Brown she did not feel safe with Bond, and reminded him she had
spoken to him before about her poor relationship with Bond. *Id.* at 51.

Miguel Alers testified that after his gun was taken he talked with Det. Szustowicz,
in October of 2006. *Id.* at 99. He also talked with Cpt. Seaborough in October, after the
gun was taken.  *Id.* at 100-02.  He filed EEO complaints because there was no
"movement" by the Captain on the investigation of Alers' gun. *Id.* at 101. Cpt.
Seaborough talked with Alers during November of 2006 because Cpt. Seaborough had
received information that Alers had filed an EEO complaint. *Id.* at 100-02. Alers related
that he filed a federal EEO complaint on November 1, 2006, and believed he filed one
with the City in December of 2006. *Id.* at 102. He noticed that Cpt. Seaborough was
constantly watching Alers and Szustowicz when they talked. *Id.* at 106.  He said the
Captain's conduct was unusual, and had not happened before the Captain had spoken to

---

[3] There was no objection to this hearsay within hearsay.

Alers about his EEO complaint. *Id.* at 107. He relayed his concerns about the Captain watching them to Det. Szustowicz. *Id.* at 106-07.

On approximately January 18, 2007, Szustowicz was called into Cpt. Seaborough's office with Lt. Brown, and told she was being moved "because I wasn't loyal." T.T. 10/6/15 (Doc. No. 195) at 38-39. On January 23, 2007 Szustowicz gave a statement as part of the EEO investigation of Alers' complaint. *Id.* at 30, 39. Szustowicz requested a transfer to Northwest Detectives in January 2007, because "I felt like I was being set up. And I wanted to be with my old lieutenant." *Id.* at 60-61. Sometime in January Szustowicz told Cpt. Seaborough that "because I helped Miguel she [Seaborough] was coming after me." *Id.* at 93. Cpt. Seaborough did not respond. *Id.*

On March 5, 2007 Szustowicz was given a reprimand for calling Lt. George Ondrejka a "loser" near the District holding cell, in the presence of patrol officers and civilians. *Id.* at 64; Joint Exhibit 5 (JE 5). Szustowicz explained that she and Ondrejka had made a good-natured bet about whether the DA's charging unit would approve an arrest for an elderly woman who had brought a gun to court. *Id.* at 65-66. They had been kidding around in the squad car on the way up to serve a warrant, at which Szustowicz almost got shot. *Id.* at 66. When they found out that Ondrejka lost the bet Szustowicz called him "loser" several times, in response to comments from Ondrejka. *Id.* After receiving a written reprimand, Szustowicz complained to Ondrejka. *Id.* at 68.

In early May, 2007 Szustowicz was again reprimanded by Cpt. Seaborough. *Id.* at 70. Seaborough questioned Szustowicz about examining daily attendance reports (DARs) for other officers. *Id.* at 71. Anyone in the police department can examine the DAR system for information about other police officers' whereabouts and attendance.

*Id.* at 72. There is no policy to the effect that police are not permitted to look in the DARs. *Id.* at 72. Szustowicz had spoken to a police internal affairs unit ("Impact") about irregularities in time reporting at Central Detectives. *Id.* at 73-74. Nevertheless, Szustowicz denied looking at DARs during the interview with Cpt. Seaborough. *Id.* at 76. Szustowicz believed that at that time she had not. *Id.* at 76; JE 13 (p. D1769). She also believed that police policy permitted her not to disclose her cooperation in an internal affairs investigation.  *Id.* at At some point, based on her review of DARs given her by another detective, Szustowicz concluded that Lt. Brown was "switching his tour of duty" in the DARs in order to claim overtime he did not actually earn. *Id.* at 78. Szustowicz reported this to Internal Affairs in approximately May of 2007. *Id.* at 78, 80.

As for the racially offensive remark, Szustowicz filed her own EEOC complaint on March 23, 2007. *Id.* at 56. In the complaint Szustowicz alleged she had been retaliated against for instructing Alers to file his EEO charge. *Id.* at 57. On July 3, 2007 Szustowicz gave Cpt. Seaborough a memorandum telling her of the EEO charge. *Id.* at 58, 92. That same day Szustowicz was transferred to Northwest Detectives, a division that was not under Cpt. Seaborough's command. *Id.* at 59-60, 82. Nevertheless Szustowicz was required to return to Central Detectives to be interviewed by Cpt. Seaborough about the DARs, in addition to an investigation Cpt. Seaborough had launched into alleged racial comments by Szustowicz. *Id.* at 83-87.[4] During an interview on July 9, 2007, Cpt. Seaborough asked if Szustowicz had called anyone a "spook" or "monkey." *Id.* at 90; JE 13. Szustowicz denied these allegations. T.T. 10/6 (Doc. No. 195) at 87-88, 90.

---

[4] The comment at issue was that had said that someone was "more nervous than a spook in a spelling bee." T.T. 10/6 (Doc. No. 195) at 89.

Szustowicz believed, based on all that happened to her, that she was being retaliated against by Cpt. Seaborough for helping Alers and reporting overtime abuses to Internal Affairs. *Id.* at 93.

On August 15, 2007 Cpt. Seaborough issued three "Statement[s] of Charges Filed and Action Taken" (Form 75-18), charging Szustowicz with "conduct unbecoming an officer." JE 22, 23, 24. The first Statement of Charges alleged that Szustowicz had made a variety of insulting remarks, including those of a racial nature. JE 22; T.T. 10/6 (Doc. No. 195) at 90, 100. The second Statement of Charges alleged that during the July 9, 2007 interview Szustowicz had been "less than truthful" in answering questions about her review of DARs and the racially offensive comments. JE 23; T.T. 10/6 (Doc. No. 195) at 101. The third Statement of Charges alleges that Szustowicz was insubordinate, having been ordered not to look into DARs and having disobeyed the order. JE 24; T.T. 10/6 (Doc. No. 195) at 101-103.

Szustowicz explained that she had related to a fellow officer a story about two police officers who had gotten in trouble over a racially offensive comment. T.T. 10/6/15 at 1:47 p.m. (T.T. 10/6 (Doc. No. 196) at 6. She related the story as a warning "to watch what you say because look what happened to this - - this Cpt. Thompson, Tommy Thompson was his name." *Id.* at 6. She told the story to Det. Castro sometime in 2006, and possibly as early as 2005, but was not investigated for telling the story until 2007. *Id.* at 10. She had heard the story from another officer, and had heard it repeated by others several times. *Id.* at 8-9. She had never been asked to cooperate in an investigation of any other officer for repeating the story. *Id.* at 9. She had not been

7

investigated for telling this story until Cpt. Seaborough interviewed her July 9, 2007. *Id.* at 11.

Szustowicz had a hearing on the charges in January of 2008. *Id.* at 12-13. She wished to call a witness to the hearing, Sgt. Nadolski of internal affairs, who knew that Szustowicz was a cooperating witness in the internal affairs investigation of overtime abuses at Central Detectives. *Id.* at 11-12. Szustowicz asked for a continuance because her witness did not show up. *Id.* at 14. He was on vacation the date of the hearing. *Id.* at 20. Szustowicz did not want to proceed without Sgt. Nadolski. *Id.* Cpt. Flacco, the police advocate, advised her that the hearing would go forward and that Szustowicz would get a 30-day suspension and a finding on her record that she had lied. *Id.* Such a result would mean that Szustowicz could no longer testify as a police officer. *Id.* at 15. Flacco offered Szustowicz a plea to 21-days suspension and a lesser offense. *Id.* at 14-15. After entering the plea, Szustowicz concluded that she had been "set up" and sought to withdraw the plea. *Id.* at 20-21. She made a formal request to withdraw, but the Police Commissioner decided not to allow Szustowicz to withdraw her plea. *Id.* at 22.

Szustowicz went to the Mayor's office to attempt to overturn the Commissioner's decision. *Id.* at 24. Plaintiff met with Joan Markman, the Mayor's chief integrity officer (CIO). *Id.* As a result of this meeting there was correspondence between Ms. Markman and the Police Commissioner. *Id.* at 26; JE 50-51. Ms. Markman recommended that the Commissioner reconsider his decision not to permit Det. Szustowicz to withdraw her guilty plea. JE 51 (letter date June 2, 2008). Because Ms. Markman had passed away before trial, the parties crafted a stipulation concerning her duties as the chief integrity officer. *Id.* at 30-31; JE 64. The Police Commissioner did not report to CIO Markman

and was not bound by her advice. *Id.* at 31. CIO Markman did not refer Det. Szustowicz's complaint "to any law enforcement agency, Ethics Board or City Inspector General." *Id.* at 31. The Commissioner did not order a rehearing. *Id.* at 32.

Plaintiff was suspended for 21 days, the equivalent of a month and a day of work. *Id.* at 46. She lost approximately $5,000.00 of pay. *Id.* at 47.  She was embarrassed and humiliated by the investigation and charges. *Id.* at 49. The investigation portrayed her as "something that I'm not." *Id.* at 50. She had trouble sleeping and almost quit the police force. *Id.* Because of the stress she took four or five months of sick leave, which she will not receive as part of her retirement. *Id.* at 50-51. She had to take a home equity loan after her suspension in order to support herself. *Id.* at 52. The investigation and discipline made her "completely angry and frustrated that I was doing the right thing for a job that I loved and I was really good at and I did the right thing and I got hurt by it." *Id.* at 52. While suspended Det. Szustowicz was ineligible to make overtime. *Id.* at 53-54. Her reputation within the police department was affected: her suspension made transferring to other units more difficult. *Id.* at 54. This affected her ability to transfer to specialized units within the department. *Id.* at 55-56. For instance, a transfer to homicide was out of the question. *Id.* at 56. At homicide she could have made much more money working overtime. *Id.* at 56.

In October 2008, Alers and Szustowicz filed this lawsuit against the City in the Eastern District of Pennsylvania.  They accused the City of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964; discrimination and retaliation in violation of 42 U.S.C. § 1983; violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; and violations of a number of state laws. On January 24, 2013,

Judge Jones granted summary judgment in favor of the City on all claims except for Szustowicz's Title VII retaliation claim. *See Alers v. City of Philadelphia*, 919 F. Supp. 2d 528 (E.D. Pa. 2013).

On March 16, 2015, this case was referred to the Honorable Lynne A. Sitarski for trial, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. *See* Doc. No. 121. One month later, on April 16, 2015, Judge Sitarski recused herself from the matter. *See* Doc. No. 128. Judge Jones then referred the case to me on April 22, 2015. *See* Doc. No. 130. A jury trial was held between October 5, 2015 and October 14, 2015. On October 14, 2015, the jury returned a verdict in favor of Szustowicz in the amount of $265,000.00. *See* Doc. No. 160.

A flurry of post-trial motions followed. These were subject to considerable delay due to difficulties securing the full trial transcript, as well as requests for additional time for briefing. *See* Doc. No. 203. In addition, the parties attempted to settle their differences during the summer of 2016. Those efforts have concluded, and the post-trial motions are ripe for determination.

The City argues that I should grant judgment in its favor, or a new trial, because Szustowicz  failed to show that the PPD retaliated against Szustowicz in response to her engaging in activities protected by Title VII. *See generally,* Doc. No. 213, Defendant's Memorandum of Law (Def. Mem.) at 7.  There are two threads of argument, the first regarding Szustowicz's allegations about retaliation for assisting Alers, the second regarding her allegations about retaliation related to her own complaint of discrimination.

10

1.      As to Alers' complaint, the City contends that Szustowicz failed to establish a causal link between Szustowicz's assisting Alers and the alleged adverse employment action against Szustowicz. *Id.* at 7-8.

- The City contends that Szustowicz failed to establish that Seaborough knew that Szustowicz was assisting Alers prior to the time that Seaborough forced Szustowicz to switch partners. *Id.* at 9-10.

- The City contends that there was insufficient evidence from which the jury could infer retaliatory intent merely from switching partners. *Id.* at 10-11.

- The City contends that the temporal link between the switching of partners and Captain Seaborough's investigation was too remote to establish causation. *Id.* at 18.

- The City also contends that Szustowicz did not establish a good faith basis to believe that Alers stated a claim of race discrimination. *Id.* at 12-14.

2.      As to her own complaint of discrimination, the City contends that Szustowicz failed to establish retaliation. *Id.* at 14-16.

The City argues that, if I do not grant judgment notwithstanding the verdict, or a new trial, I should grant nominal damages of one dollar because Szustowicz failed to prove emotional damages. *Id.* at 16-19.The City argues in the alternative that I should order a remittitur. *Id.* at 19-23.

In response, Szustowicz contends that the jury was given sufficient evidence to infer the link between the protected conduct and the retaliation, and that the jury's verdict should stand. *See generally,* Doc. No. 216. Szustowicz also argues that the City

did not properly raise its Rule 50(a) motion and, therefore, is precluded from bringing this Rule 50(b) motion in the first instance.

## II.    APPLICABLE LEGAL STANDARDS

### A.  *Standard of review for post-trial motions.*

#### *1. Rule 50 Judgment as a matter of law*

Federal Rule of Civil Procedure 50 provides that a court may enter judgment as a matter of law if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." *See* Fed. R. Civ. P. 50(a)(1). In ruling on the City's motion, I must draw all reasonable inferences in favor of Szustowicz and can neither make credibility determinations, nor weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Entry of judgment as a matter of law is appropriate only if "viewing the evidence in the light most favorable to the non-movant [Szustowicz] and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Warren*, 278 F.3d at 168. Put another way, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *See Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir. 1993) (quotation omitted).

#### *2. Rule 59 grant of a new trial.*

In addition to requesting that judgment be entered in its favor notwithstanding the verdict, the City alternatively seeks a new trial or remittitur.  Federal Rule of Civil Procedure 59 provides that I may grant a new trial following a jury verdict "for any

reason for which a new trial has heretofore been granted in an action at law in federal court." *See* Fed. R. Civ. P. 59(a)(1)(A). "The law is such that 'a new trial should be granted only when the verdict is contrary to the weight of the evidence or when a miscarriage of justice would result if the verdict were to stand.' *Brennan v. Norton,* 350 F.3d 399, 430 (3d Cir.2003)." *Holt v. Pennsylvania*, No. CV 10-5510, 2015 WL 4944032, at *25 (E.D. Pa. Aug. 19, 2015). If there is a reasonable or rational basis for the verdict, it should not be set aside. *See Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 202 (3d Cir.1996). "In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion. Fed.R.Civ.P. 50(b)." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1172–73 (3d Cir. 1993).

### 3.  Plaintiff's waiver argument.

At the outset, Plaintiff has argued that the City waived its Rule 50 arguments because it did not include them in its Rule 50(a) motion just prior to the case going to the jury for deliberations. *See* Pl. Br. at 5. This is incorrect. The City's argument is that 1) there was an insufficient causal link between plaintiff's protected conduct and Seaborough's alleged retaliatory acts, and 2) plaintiff did not have a good-faith basis to believe that Alers made a valid race discrimination claim. Def. Br. at 7-14. The trial transcript reflects that counsel for the City clearly stated each of these arguments during its oral Rule 50(a) motion. *See* T.T. 10/13/2015 (Doc. No. 209) at 60:7-16.[5]

---

[5] "Both he [Alers] and Det. Szustowicz testified that she had a conversation with him and advised him to do it. She certainly hasn't -- excuse me, I shouldn't say, she --

I will consider the City's arguments on the merits.

## III.   DISCUSSION

### *A. The evidence was sufficient.*

The City contends that despite the verdict, I should enter judgment in its favor on Szustowicz's Title VII retaliation claim. In support of that argument, the City claims that 1) there was insufficient evidence of a causal link between Szustowicz's assistance to Alers and Seaborough's investigation into her conduct and 2) Szustowicz failed to establish that she had a good-faith basis to believe that Alers made a valid race discrimination claim. *See* Def. Mem. at 7-14. The City also argues that the evidence was insufficient to establish retaliation based on Szustowicz's own complaint. Def. Mem. at 14-15. Szustowicz argues that "the trial transcript is replete with competent admissible evidence sufficient to support the Jury's verdict." *See* Pl. Br. at 9. I find that, viewing the evidence in a light most favorable to the Szustowicz, there was sufficient evidence from which a reasonable factfinder could conclude that Szustowicz was retaliated against for helping Miguel Alers file complaints, and for filing her own.

  1.  *There was sufficient evidence of a causal link between Szustowicz's assistance of Alers and Seaborough's investigation of Szustowicz.*

To establish a *prima facie* case of retaliation Szustowicz needed to demonstrate that: (1) she engaged in protected employee activity; (2) her employer took a materially adverse action or actions against her; and (3) there was a causal relationship between

---

plaintiff has certainly not established that there was a good faith basis for her making that suggestion. And additionally, she has not established that Captain Seaborough was aware that she had advised him to file a complaint, or that she had even filed her own complaint until July 3rd. So in terms of the time line, and the knowledge of Captain Seaborough, that's not there."

the protected activity and the adverse action.  *Marra v. Philadelphia Housing Authority,* 497 F.3d 286, 300 (3d Cir. 2007).   The third prong, the causal link, may be established through evidence that illustrates "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (internal quotation marks omitted). Timing alone will not support a finding of causation unless "unusually suggestive[.]" *Morrissey v. Luzerne Cnty. Cmty. Coll.*, 117 F. App'x 809, 816 (3d Cir. 2004) (non-precedential) (citing *Krouse*, 126 F.3d at 503)).  If Szustowicz failed to establish a prima facie case, the City is entitled to judgment as a matter of law.  *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 n.4 (3d Cir. 1999).

The City contends that Szustowicz failed to establish the third element of her *prima facie* case – the causal relationship between her protected activity and the alleged retaliation by the City. I have broad discretion to cull the record for evidence supportive of that link.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) ("[W]e have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider [to establish the causal link].") "Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Id.* at 280–81. I find that there was sufficient evidence for a reasonable juror to have found a causal connection between Szustowicz's

assistance with Aler's EEO and/or EEOC complaint(s) and the alleged retaliatory conduct.

The City argues that there was no evidence that Cpt. Seaborough was aware that Szustowicz had helped Alers. I disagree. The jury could have drawn a reasonable inference from testimony from Alers and Szustowicz that Cpt. Seaborough indeed was aware of both Alers' complaint and Szustowicz's assistance by the time of the partner shifting incident in November of 2006.

Alers and Szustowicz talked in October of 2006. T.T. 10/6 (Doc. No. 196) at 99. After the conversation, Alers noticed that Cpt. Seaborough was constantly watching Alers and Szustowicz when they talked. *Id.* at 106.  He said the Captain's conduct was unusual, and had not happened before the Captain had spoken to Alers about his EEO complaint. *Id.* at 107. He relayed his concerns about the Captain watching them to Det. Szustowicz. *Id.* at 106-07. After Alers and Szustowicz spoke, Alers warned Szustowicz that they had been seen talking and that "they were out to get me." T.T. 10/6 (Doc. No. 195) at 35. Alers relayed to Szustowicz that someone told Alers that the captain [Seaborough] "mentioned that she had observed me speaking to him and did not like it." *Id.* at 48-49.[6] Szustowicz and Alers were talking together at one point about Alers' situation when Sgt. Jones happened upon them. *Id.* at 42. Seaborough acknowledged that she was aware of issues surrounding Alers in 2006. *See* T.T. 10/7 (Doc. No. 197) at 8.

Alers talked with Cpt. Seaborough in October, after the gun was taken, and filed EEO complaints because there was no "movement" by the Captain on the investigation

---

[6] There was no objection to this hearsay within hearsay.

of Alers' gun. T.T. 10/6 (Doc. No. 196) at 100-02. After Alers filed the EEO complaint, Seaborough "called me into her office after receiving a phone call from the EEO Unit. . . ." *See id.* at 102. This conversation occurred sometime in November of 2006. *Id.* Cpt. Seaborough talked with Alers because Cpt. Seaborough had received information that Alers had filed an EEO complaint. *Id.* Alers related that he filed a federal EEO complaint on November 1, 2006, and believed he filed one with the City in December of 2006. *Id.* at 102. In sum, Alers testified that he spoke with Szustowicz sometime in October, filed an EEO complaint on November 1, 2006, that Cpt Seaborough learned about the EEO complaint sometime after it was filed, and that she spoke with him about it in November of 2006. T.T. 10/6 (Doc. No. 196) at 102. Szustowicz testified that the partner switch happened on November 19, 2006. T.T. 10/6 (Doc. No. 195) at 57. The chronology is not crystal clear, but a reasonable juror could have concluded that Seaborough learned of Alers' complaint shortly before the reassignment happened in November of 2006, and just a few weeks after Szustowicz had counseled Alers to file an EEO complaint in October of 2006.

"Determining whether temporal proximity alone may create an inference of retaliation is 'essentially fact-based … depending … on how proximate the events actually were, and the context in which the issue came before us.'" *See Mclaughlin v. Fisher*, 277 Fed. Appx. 207, 219 (3d Cir. 2008) (not precedential) (quoting *Farrell*, 206 F.3d at 279). The jury reasonably could have found that helping Alers file his EEO complaint triggered the Plaintiff's partner switch, as well as other antagonistic action. "[T]iming plus other evidence" reasonably could have supported such a conclusion.

*Blakney v. City of Philadelphia,* 559 Fed. Appx. 183, 186 (3d Cir. 2014) (not precedential).  (citing to *Farrell*, 206 F3d at 280).

The jury might reasonably have concluded that Seaborough, a police captain with many years of experience, knew about Alers' complaint, as well as Szustowicz's assistance, and that the partner switch, accomplished so close in time to Seaborough learning of Alers' complaint, was an effort to retaliate against Szustowicz for helping Alers.

The City argues Szustowicz's re-assignment was nothing more than a *de minimis* action which "does not suggest retaliatory intent at all. . . ." Def Mem. at 8. While a single antagonistic action may not suffice to constitute retaliation, a pattern of antagonistic actions can serve to unite a retaliatory end result with a protected act. *See, e.g.*, *Washco v. Fed. Express Corp.*, 402 F. Supp. 2d 547, 560 (E.D. Pa. 2005) (discussing patterns of antagonism). If the jury believed Szustowitz's testimony that Captain Seaborough assigned Szustowitz to Officer Bond in retaliation for her helping Alers – and I must assume it did – the jury could infer that re-assignment to work with an entirely incompetent, if not criminally negligent, co-worker was the direct result of Szustowicz's interaction with Alers.[7]  As such, the re-assignment cannot fairly be characterized as *de minimis.* Nor was the reassignment the only incident.

In addition to the re-assignment, Szustowicz contends that she was retaliated against for reporting discrepancies in daily attendance reports (DARs). In May of 2007,

---

[7] In addition to her concerns about serving warrants with Bond, Szustowicz explained that she protested the re-assignment because she had concerns about Bond's conduct at work. Bonds would regularly arrive late for his shifts, allow his second job with Major League Baseball to interfere with his police duties, and take the squad car with him to go to baseball games. *See* T.T. 10/6 (Doc. No. 195) at 31-32.

Szutowicz was called into Seaborough's office to explain why she had examined DARs from other officers. *See* T.T. 10/6 (Doc. No. 195) at 70. Szustowicz had received the DARs from Detective Dave Smith, which purported to show overtime discrepancies. *See id.* at 77-78. Plaintiff later mailed the questionable DARs to Internal Affairs for further investigation. *Id.* at 79. The receipt of the DARs from Detective Smith and Szustowicz's mailing of them to Internal Affairs happened just prior to Szustowicz confirming  a transfer request in May of 2007. *Id.* at 80.

Plaintiff transferred to Northeast Detectives on July 6, 2007. *See* JTE 26. The transfer removed Szustowicz from Seaborough's supervision.[8] On July 9, 2007, Szustowicz returned to Central Detectives to be interviewed by Seaborough. T.T. 10/6 (Doc. No. 195) at 82-83; *see also* JTE 13 (noting a July 9, 2007 interview date).  This interview related to the DARs that Szustowicz mailed to Internal Affairs. T.T. 10/6 (Doc. No. 195) at 83-84. Szustowicz explained that she was never given a written order not to access the DARs. *Id.* at 86. Furthermore, because there was an Internal Affairs investigation launched as a result of the DARs Szustowicz provided, Szustowicz believed that she was under no obligation to tell Captain Seaborough that she had accessed those DARs in the first place. *Id.* at 86. It is routine in Internal Affairs investigations that individuals are told not to reveal that they have been speaking to investigators. *See id.* at

---

[8] There was some dispute during the trial over the difference between "transfer" and "detail." A detail means that a police officer is assigned work in another district, while still supervised by their superior officer from the sending district, while a transfer means another supervisor takes over responsibility for managing that officer. *See* T.T. 10/6 (Doc. No. 195) at 82-83; *see also* T.T. 10/7 (Doc. No. 197), at 56 (noting a similar description from Captain Seaborough). Whether Plaintiff had been transferred or detailed was a question for the jury to resolve.

86-87. In addition to the DAR issue, Szustowicz was also confronted regarding alleged racial remarks she made in the presence of co-workers. *See id.* at 90.

The jury could have found that a pattern of antagonism overcame concerns about temporal proximity. The Third Circuit has stated that temporal proximity[9] between the protected act and the retaliatory act is necessary to prove a retaliation claim. *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000).  A jury reasonably could have found that no more than two weeks separated Szustowicz's assistance of Alers and the switch in partners to Officer Bond. T.T. 10/6 (Doc. No. 195) at 35. The jury might also reasonably have concluded that even less time separated Cpt. Seaborough's learning of Alers' EEO complaint and Szustowicz's partner switch. *Compare* T.T. 10/6  (Doc. No. 195) at 30, 35, 57 (reassignment) *with*  T.T. 10/6 (Doc. No. 196) at 100-02 (Alers conversation with Seaborough). The Third Circuit has held that temporal proximity of more than ten days triggers the need for additional evidence of retaliatory motive. *See Blakney,* 559 Fed. Appx. At 186 (citing to *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)) "We have held that such 'other evidence' may include, but is not limited to, a 'pattern of antagonism' subjecting plaintiff to a "constant barrage of written and verbal warnings and ... disciplinary actions, all of which occurred soon after plaintiff's initial complaints.'" *See id.* (quoting *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)).

---

[9] Just because an adverse action occurs after a complaint does not mean that the plaintiff can demonstrate a causal link between the two events. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997); *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760-61 (3d Cir. 2004) (over two months is not unusually suggestive).

In light of the evidence, a reasonable juror could have concluded that the switching of partners in November of 2006 was only the beginning of a series of events that were motivated by a desire to retaliate. This evidence of a pattern of events also answers the City's argument that the temporal link between the partner switching episode in November of 2006 and Seaborough's investigation of Szustowicz in July-August, 2007 was too remote. The jury reasonably could have found a pattern of antagonism that linked the partner switching episode in November of 2006 and Seaborough's investigation of Szustowicz in July-August, 2007.

2.    *Plaintiff's good faith belief in the merits of Alers' complaint.*

The City also contends that Szustowicz cannot show a good faith belief in the merits of Alers' EEO complaint. Def. Mem. at 12-14.Plaintiff argues that she was not required to show a good faith belief in the merits of Alers' EEO complaint. She points out that both the opposition and participation clauses found in Title VII were tried. *See* Pl. Rep. Br. at 2. She explains that

> [t]he 'participation' clause protects any person who has participated in any manner in Title VII proceedings (or the necessary precursors to such proceedings). The opposition clause is for a person who has him or herself opposed illegal employment practices under Title VII. Good faith is normally not required for [a] participation claim under the retaliation statute. Indeed, the majority rule is that all manner of participation is protected, even if done in bad faith.

*See id.* at 2 (citing EEOC Guidelines, vol. 2, § 8-II.C.2).

The Third Circuit agrees that Title VII protects both individuals who participate in Title VII proceedings, and those who oppose discrimination. *See Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006). Supreme Court precedent requires that an "employee must hold an objectively reasonable belief, in good faith, that the activity they

21

oppose is unlawful under Title VII." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (citing to *Clark County v. Breeden*, 532 U.S. 268, 271 (2001)). This aligns with earlier Third Circuit precedent, which requires that a retaliation plaintiff must act under a reasonable belief that a violation of Title VII occurred. *See id.* (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996)).

While in *Moore* the Third Circuit held there must be a good faith belief in the merits of a claim in opposition cases, the same is not necessarily true in a participation case. Plaintiff's suggestion that all manner of participation is protected "even if done in bad faith," is an overstatement. *See* Pl. Rep. Br. at 2. Nevertheless, the EEOC guidelines states that "courts have consistently held that a respondent is liable for retaliating against an individual for filing an EEOC charge *regardless of the validity or reasonableness* of the charge." *See* EEOC Guidelines, vol. 2, § 8-II.C.2. (citing *Wyatt v. Boston*, 35 F.3d 13, 15 (1st Cir. 1994)) (emphasis added). That reading implies that a defendant can be liable for retaliation against a plaintiff even if the underlying charge in which he or she participated is ultimately found to be without merit. The Court in *Wyatt* confirmed this, writing that, as to the participation clause, there is no requirement that the underlying charges be valid or reasonable. *See* 35 F.3d at 15.

In *Slagle*, the Third Circuit cited to the *Wyatt* case in holding that the participation clause does not require the charges to be valid or reasonable. *See* 435 F.3d at 268 (citing *Wyatt*, 35 F.3d at 15). Though Alers' allegations were ultimately dismissed, I find that they do not rise to the level of bad faith as a matter of law. More importantly, I find that Szustowicz participated in Alers' claims in good faith. It is not necessary to decide whether someone who participated in bad faith is protected.

22

### 3. *The evidence is sufficient to establish retaliation based on Szustowicz's own complaint.*

The City argues that Szustowicz has failed to establish retaliation related to her own complaint. Def. Mem. at 14. Captain Seaborough initiated the investigation into Plaintiff's use of racial epithets on July 2, 2007, a day before Szustewicz gave Seaborough a memorandum with her EEO charges attached. Def. Br. at 15. In order to prove retaliatory intent, a plaintiff must show that the employer had knowledge of the protected act, in this case, plaintiff's EEO filing. *See id.* (citing *Doyle v. U.S. Sec'y of Labor*, 285 F.3d 243, 250 (3d Cir. 2002)). Seaborough testified that she knew about Szustowicz's EEO complaint on July 3rd. *See* T.T. 10/7/15 (Doc. No. 197) at 71. There are several reasons why I disagree with the City's argument.

First, the *Doyle* case does not control. In *Doyle*, a company named Hydro, in the business of decontaminating nuclear power plants, recruited the plaintiff to help with the decontamination of a plant in Michigan. 285 F.3d at 245. Doyle was given a standard release form to sign, but he refused because he believed that one of the paragraphs in the form waived his right to file a charge under Section 210 of the Energy Reorganization Act of 1974, 42 U.S.C. § 5851 ("ERA"). *Id.* at 246. The Third Circuit found that the plaintiff never engaged in a protected activity by refusing to sign the waiver. *Id.* at 251.

Here, by filing a complaint with the EEOC and the police department's EEO unit, Szustowicz clearly engaged in protected activity. Doyle failed to prove by a preponderance of the evidence that the defendant was using the waiver form as a means to obscure discriminatory motives. *Id.* at 252. The company gave waivers to all

applicants for temporary positions and "the record does not illustrate that Hydro

previously made exceptions in its hiring practices for applicants, if there were any,

similarly situated to Doyle who insisted on signing a modified version of the

authorization or on not singing the authorization at all." *Id.* at 253.

In this case, by contrast, there was no evidence of a policy prohibiting police

employees from looking at other officers' DARs. Nor was there any evidence that

employees other than Szustowicz ever were disciplined for looking at DARs, according

to Deputy Commissioner Gaittens:

> Q: To your knowledge, was there any directives that specifically stated that
> officers could not go into the DAR system, review it for other officers[,] and make
> any printouts?
> A: No.
> Q: In your 33 years [at the Philadelphia Police Department], have you ever heard
> of an officer who was disciplined because they had acquired a DAR from another
> officer and turned it into IMPACT?
> A: For specifically acquiring—
> Q: Yes.
> A: ---just by itself, no.

*See* T.T. 10/7 (Doc. No. 207) at 34.

A considerable amount of trial time was devoted to tracing the history of the

racially offensive remark that plaintiff made.[10]  The jury could have concluded that the

remark had been made many times within the Philadelphia Police Department and had

not been the subject of any discipline. Testimony from Lieutenant Richard Thompson, a

now retired Philadelphia Police Detective, indicated that the racial comment was first

made "between 15 and 18 years ago." T.T. 10/6/2015 (Doc. No. 206) at 14. The comment

---

[10] The remark was that certain members of the detective division were "sweating more
than a spook at a spelling bee. . . ." along with allegations that Seaborough had been
called "a monkey." *See* T.T. 10/7 (Doc. No. 197) at 58.

had achieved such notoriety that Thompson was frequently confused[11] for the person

who initially made the comment:

> A: I guess invariably no matter where I worked somebody would hear it from somebody else and they would say that must be your Sergeant or that must [be] your Lieutenant. They'd come and ask me. I said, no, that wasn't me. It was my cousin.
> Q: Did they repeat the comment?
> A: Yeah. And sometimes it was actually more outrageous than the comment itself, so I had to correct them from what I understand happened.

*Id.* at 15. Thompson also claimed that he heard the comment multiple times since 1998.

*Id.* at 20. Deputy Commissioner Gaittens also testified that he had heard the remark

before. *See* T.T. 10/7 (Doc. No. 207) at 27.

Plaintiff confronted and embraced the defense evidence against her, and made it

part of her case, by offering evidence that the grounds for discipline never had been

enforced against anyone except plaintiff. The jury was not required, as a matter of law,

to see the evidence defendant's way. The jury was entitled, and I am compelled, to view

the evidence in the light most favorable to plaintiff.

Second, the timing of the revelation of Szustowicz's EEO complaint was not

critical to her cause of action. Based on Alers' and Szustowicz's testimony, the jury could

have concluded that before July 2007 Seaborough knew that plaintiff had helped Alers,

that the captain had undertaken a series of antagonistic actions against Szustowicz as a

result, and that the investigation opened against Szustowicz on July 2, 2007 was simply

the next in a series of interconnected retaliatory actions. *See* T.T. 10/6 (Doc. No. 195) at

60-61 (detailing Szustowicz's request transfer request in January of 2007 over fear that

---

[11] Lieutenant Thompson was clearly uncomfortable talking about the offensive statement: "That was not my joke. I don't find it funny, but you asked me what it was, and that's why I told it." *See* T.T. 10/6 (Doc. No. 206) at 21.

she was being set-up). Finally, although the investigation began on July 2, the request for disciplinary action occurred on July 10, 2007, after Seaborough was handed the plaintiff' EEO complaint on July 3, 2007. *See* JTE 19. Thus, the jury may have concluded that the decision to pursue discipline was retaliatory, in part, for plaintiff's EEO filing, as well as for plaintiff's having assisted Alers. The jury reasonably may have concluded that but for Seaborough's intent to retaliate the investigation would not have resulted in a request for discipline. On this view of the facts, the request for disciplinary action on July 10 and the disclosure of the EEO filing on July 3 are in such close proximity that they are "unusually suggestive" of retaliatory intent.

Viewed in the light most favorable to plaintiff, the testimony and exhibits presented to the jury supported a finding that defendant retaliated against plaintiff through a series of antagonistic actions that culminated in disciplinary action against Plaintiff. The verdict will stand.

### B.  A new trial is not appropriate.

Federal Rule of Civil Procedure 59 states that I may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." *See* Fed. R. Civ. P. 59. This is a matter of sound discretion for the trial court. *See Bonjorno v. Kaiser Aluminum and Chemical Corp.*, 752 F.2d 802, 812 (3d Cir. 1984). A new trial is appropriate only when "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 128 (3d Cir. 2003) (quoting *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991)). I have explained my view of the trial evidence, in part A of this

memorandum. While I might well have decided the case differently if I were the finder of fact, I find no miscarriage of justice, nor is my conscience shocked by the verdict. I will deny the motion for a new trial.

### C. The jury did not err in awarding more than nominal damages.

The City also argues that I should direct a nominal damages judgment of one dollar because the Plaintiff failed to prove emotional damages. *See* Def. Br. at 16. They argue that there was insufficient evidence to support the amount of damages, $265,000.00. *Id.* The Plaintiff argues that Title VII allows for a broad damages recovery including, but not limited to, emotional distress damages. *See* Pl. Br. at 31. In this case, the jury awarded the Plaintiff $265,000 in damages for emotional harm.

A plaintiff claiming damages to reputation, mental anguish, or some other variety of emotional distress must provide the jury with competent evidence. *See Chainey v. State*, 523 F.3d 200, 216 (3d Cir. 2008). However, the Third Circuit does not mandate "a specific type of evidence be introduced to demonstrate injury in the form of emotional distress. *See Bolden v. Southeastern Pennsylvania Transportation Authority*, 21 F.3d 29, 36 (3d Cir. 1994) (citations omitted). Medical evidence is not needed to prove emotional distress or mental anguish. *Id.* "Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury." *See Carey v. Piphus*, 435 U.S. 247, 264 n. 20 (1978) (citations omitted); *see also B.S. v. Somerset County*, 704 F.3d 250, 273 (3d Cir. 2013) (citing *Carey*, 435 U.S. at 266). A plaintiff's own testimony,

standing alone, may be enough to sustain an emotional damages award. *See Valentin v. Crozer-Chester Medical Center*, 986 F. Supp. 292, 305 (E.D. Pa. 1997).

The City cites to a number of cases where the Third Circuit has reversed a jury award based on a plaintiff who was upset, bitter, or otherwise embarrassed because of employer-led retaliation. *See* Def. Br. at 17 (citations omitted). Here, the City argues, Plaintiff has only alleged that she was embarrassed and humiliated, there was no effect on her physical health, and she has failed to present any additional testimony to satisfy her burden of showing some kind of harm. *See id.* at 17-18 (citations omitted). While the City is careful to underscore a number of details related to the incident in question, they ignore some of the more telling signs of emotional harm. I find that there was sufficient evidence for the jury to make a more than nominal damages award.

As a result of her assisting Alers with the filing of his discrimination complaint, the jury could have concluded that Plaintiff was retaliated against in a number of different ways. She was called disloyal by her fellow officers. *See* JTE 2, at 5. She was berated by Captain Seaborough for talking about Seaborough and her conduct to other officers. *Id.* She was put in a dangerous and potentially lethal situation by being paired with a partner who was never there. *Id.* She was accused of being a racist in front of other police officers for refusing to work with that partner. *See* JTE 3, at 2.

The plaintiff explained that she was "embarrassed," that the investigation was "humiliating" and "portrayed me as something that I'm not." T.T. 10/6 (Doc. No. 195) at 49. It affected her sleeping and general attitude, to the point that she wanted to quit the police force. *Id.* at 50. In fact, the stress was so intense that "I used a lot of sick time that cost me—now it's going to cost me when I retire because I used a lot of sick time and I

came back just – I just wanted to fight it. I just – you know, I got really discouraged." *Id.* at 50. She eventually used four or five months of sick time because of stress, which will be lost to her at her retirement. *Id.* at 50. This incident now appears in her personnel file: "[i]f you put a transfer in, you know, you'll see they get the record, oh, you were suspended for – you know, they don't want you." *Id.* at 54. Though she admitted to not being able to put a concrete price on her losses, Szustowicz stated that the cost to her reputation and her career was significant: "there's no price [you can put] on your life and your reputation." *Id.* The jury heard testimony regarding how this 21-day suspension on her record would impact Szustowicz's ability to move to other, better-paying units. The Plaintiff testified that, at least within the Detective Division, any black mark on her record would make it unlikely she could work in Homicide or the Special Victims Unit. *Id.* at 56. None of this testimony is incredible as a matter of law. Neither does it violate common sense. The jury could have believed all of it. If the jury found that the disciplinary action was wrongful, they reasonably could have inferred, based on their assessment of the nature of the wrong and their assessment of Szustowicz's emotions and demeanor at trial, that plaintiff has endured ongoing emotional harm for 8 years (2007 to 2015) from this wrong.

The gist of the city's argument is that there is not much in the way of a physical injury that would lead the jury to award damages. *See id.* at 52 ("I have to be honest, I'm healthy as a horse. . . .). Third Circuit precedent holds that medical evidence is not required in order to make a damages finding for emotional distress. *See Bolden*, 21 F.3d at 36. The jury could have concluded, based on its own common sense, that the retaliation and pattern of antagonism that Szustowicz endured was profound, and that it

led to significant reputational and emotional damage. I will deny defendant's motion to reduce the award to nominal damages.

### D. Remittitur is not warranted.

The City argues that, even if I find that a new trial is unwarranted, and even if I believe that the jury found a viable basis in awarding some damages, I should remit any recovery the Plaintiff receives. *See* Def. Br. at 19. "A remittitur is a substitution of the court's judgment for that of jury regarding the appropriate award of damages; the court orders a remittitur when it believes the jury's award is unreasonable on the facts." *See id.* (citing *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999).

The Third Circuit has held that a trial judge may order remittitur only if the judge concludes that the jury verdict was clearly unsupported by the evidence and eclipses the amount needed to make a plaintiff whole. *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995). Courts may also remit the verdict if it shocks the conscience of a court. *See Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983). Judge Strawbridge has provided a very thorough and helpful analysis of when remittitur is appropriate in *Holt v. Pennsylvania*, CV 10-5510, 2015 WL 4944032, at *1 (E.D. Pa. Aug. 19, 2015); *see also Schlier v. Rice*, No. 3:04-CV-1863, 2008 WL 4922435, at *17 (M.D. Nov. 14, 2008).

For example, a plaintiff in a sex discrimination suit was awarded $20,000; she testified that she was depressed, and her testimony was enough evidence to permit a jury to rationally award her that amount in compensatory damages. *See id.* (citing *Shesko v. City of Coatesville*, 324 F. Supp.2d 643, 652 (E.D. Pa. 2004)). A plaintiff

30

awarded $850,000 in compensatory damages and $1,600,000 in punitive damages for invasion of privacy after his landlord falsely claimed the plaintiff was involved in terrorist activity following the September 11, 2001 attacks was properly awarded that amount by a jury. *See id.* (citing *Hussein v. Universal Development Management*, No. 2:01-cv-2381, 2006 U.S. Dist. LEXIS 49, at *2-*3 (W.D. Pa. 2006)). A court granted remittitur trimming a damage award from $300,000 to $75,000, based on plaintiff's failure to show that the conduct of a defendant triggered a need for psychological counseling or some other medical treatment. *See id.* (citing *Hall v. Department of Corrections*, No. 3:CV-02-1255, at *23 (M.D. Sept. 25, 2006)). The City has also provided a list of cases that reflect different damages awards. *See* Def. Br. at 20-21 (citations omitted).

I have given considerable thought to the question of remittitur. I have concluded that the verdict is neither "clearly unsupported" by the evidence, nor does it shock my conscience. *See Starceski*, 54 F.3d at 1100 (remittitur permitted when the trial judge concludes that a jury verdict is clearly unsupported by the evidence); *Kazan,* 721 F.2d at 914 (remittitur permitted when the verdict shocks the trial judge's conscience). This was not a case that called for the evaluation of sophisticated scientific evidence, or some exotic set of events remote from the average juror's ordinary experience. Nor was this a case where the jury "abandon[ed] analysis for sympathy." *Evans v. Port Auth. Of N.Y. & N.J.,* 273 F.3d 347, 352 (3d Cir. 2001). In particular, I am struck by the difference between this case and *Holt*, in which Judge Strawbridge noted the disconnect between plaintiff's testimony about emotional harm and the particular events upon which his suit was based. *See Holt*, CV 10-5510, 2015 WL 4944032, at *27 ("when the position Holt

had preferred at King of Prussia again became vacant, he declined to apply for it[.]"). In *Holt,* the court concluded that plaintiff's testimony "does not provide insight into what particular actions or which particular defendants caused him this particular harm[.]" *Id.* The plaintiff in <u>Holt</u> elaborated only on emotional harm he suffered as a result of "racially charged comments" that were no longer  in the case. *Id.*

By contrast, in this case Szustowicz "reasonably and sufficiently explain[ed] the circumstances of [her] injury[.]" *Rakovich v. Wade,* 819 F.2d 1393, 1399 n.6 (7th Cir. 1987), *vacated on reh'g. en banc on other grounds,* 850 F.2d 1180 (1988).  There was no disconnect between her allegations of wrong and her claims of emotional harm. The jury was entitled to conclude, based on the evidence, that the City's retaliatory actions were designed to punish her for participating in Alers' EEO complaint and filing her own. The jury also could reasonably conclude that these retaliatory actions put Szustowicz in danger of life and limb by pairing her with a negligent partner, put her out on sick leave for 4 or 5 months, left her angry, humiliated, and with a permanent – and wrongful - mark against her that would stay with her the rest of her career.

The verdict strikes me not as a disconnect, but as a reasonable view of the evidence. It may not have been one I would have adopted, had I been a jury. But that is not the question, when considering remittitur. This case was about the evaluation of the motives and intentions of an employee and a supervisor in a day-to-day working environment. The jury had to assess how severely these work place stresses affected the plaintiff. It is hard to imagine a case better committed to the collective judgment of a jury. "[R]espect [for] the jury's important role in our legal system" should

not be limited to those instances when I can endorse a verdict as one I would have returned myself. *See Grazier,* 328 F.3d at 129.

This jury struck me as attentive, reasonable, intelligent, diverse, and fair. I will let their verdict stand, and I will not order remittitur.

### E.  Allegations of juror misconduct are unfounded.

Finally, there are lingering allegations in this case of juror misconduct during *voir dire*. After careful review, I find that the allegations  have not been sustained.

In analyzing any allegations of juror misconduct, it is important to note that a juror may not impeach her own verdict. Fed. R. Evid. 606(b). This rule is designed to promote a verdict's finality and maintain the integrity of the jury as a decision-making body. *See Virgin Islands v. Gereau*, 523 F.3d 140, 148 (3d Cir. 1975). The Supreme Court has held that to obtain a new trial because of a juror's erroneous answer to *voir dire* requires "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *cf. Williams v. Price*, 343 F.3d 223, 230 (3d Cir. 2003) (citing and discussing *McDonough* in a habeas corpus context).

The first prong of *McDonough* requires a showing that the juror intentionally and deliberately withheld material information; a mistaken answer is not sufficient to trigger a new trial. *See id.* at 555; *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989) (a juror intentionally withheld the fact that her brother was a lawyer for the government); *Abiff v. Government of Virgin Islands*, 313 F.Supp.2d 509, 512 (D. Vi. 2004) (a juror failed to admit that he knew a defendant's family and various alibi witness slated to

33

testify.). Under *McDonough's* second prong, the moving party "must establish that a truthful response during the course of *voir dire* would have provided a basis for a challenge to remove that juror for cause." *McDonough*, 464 U.S. at 556. The standard for whether a juror should be removed for cause is defined by the Third Circuit as whether the juror has "a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *U.S. v. Murray*, 103 F.3d 310, 323 (3d Cir. 1997).

I held a hearing on November 2, 2015 to address the issues surrounding supposed false statements made by Juror Number One during *voir dire*.[12] *See* Doc. No. 172, at 2-5. The City was concerned because they had spoken to the juror at *voir dire* to learn more about her work experiences and the Juror had not indicated that any retaliation occurred. *Id.* at 2. By contrast, during conversation with defense counsel after the verdict, the juror indicated she had experienced some work place retaliation. *See Id.* at 3.

After the jury's verdict, in the courtroom, in the presence of plaintiff's counsel, counsel for the defense engaged the juror in conversation.[13] Plaintiff's counsel indicated he left after questions started to touch on deliberations, a subject Plaintiff's counsel wanted to avoid. *See* Doc. No. 175, at 6; post-trial hearing transcript (P.T.T. 11/2/2015

---

[12] These proceedings were closed and the transcript of that matter was filed under seal. *See* Doc. No. 188. I will not identify the juror by name.

[13] I had previously spoken with the jurors in the jury room, and told them that they were under no obligation to speak with either counsel, but that if they were willing to do so, counsel were still in the courtroom, and any juror willing to speak with counsel could do so by going back to the courtroom. Juror #1 returned to the courtroom.

(Doc. No. 188) at 15-17. Plaintiff's counsel was more concerned about finding out if he presented his case logically and if the timeline made sense. P.T.T. at 15.

At the post-trial hearing, the City questioned the juror, who explained her response to *voir dire* question six regarding whether anyone had made a complaint on their own or on behalf of another person about employment discrimination or retaliation. *Id.* at 29. The juror responded that she remembered the question, but explained that:

> I made a complaint that I didn't think I was being treated fairly, but I never went back about retaliation, because when I spoke to HR, the HR director that I spoke to, he said now, if there's any retaliation, I want you to come back and tell me, and I never – I never went back and filed a retaliation claim.

*Id.* When the City's attorney insisted that the juror *had* made a complaint about being treated unfairly, the juror stated that she was not being discriminated or retaliated against, only that she was being treated in an unfair manner. *Id.* at 30. The juror explicitly stated "I don't think I would have answered [the *voir dire*] questions differently." *Id.* at 31. Plaintiff's counsel asked the juror if she had answered all the questions during *voir dire* truthfully and honestly as she understood them. *Id.* at 33. The juror answered in the affirmative.

I questioned the juror on the same subject. She explained that her experience centered on complaints that her work was being unfairly audited compared to other project managers. *Id.* at 25. She went to Human Resources, filed a complaint, and her performance rating went from "good" to "poor," which she "felt that that was directly related to kind of the fact that I had gone to [Human Resources]." *Id.* But the juror

35

admitted "[t]hat's all the further it went. I ended up leaving the company on good terms." *Id.* at 26.

I also asked the juror if she had an opinion about people who made employment discrimination or retaliation complaints.[14] *Id.* The juror said she did not have an opinion either way. *Id.* When asked to explain her opinion about people who file lawsuits, she gave the same answer, "although when I did come in [to the courtroom] after the trial, I remember saying you can't fight city hall, and I think that it takes a lot of courage to stand up and try to fight city hall." *Id.* at 27. That was not based on something that happened to her directly, merely a belief that the juror had. *Id.* Additionally, the juror insisted that she did not have an opinion either way regarding whether too many employment discrimination lawsuits are filed. *See id.* The juror also answered in the negative to questions related to whether her personal beliefs regarding employment discrimination would affect her judgment and a catch-all question regarding an inability to serve on the juror because of a personal matter. *Id.* at 28.

The City argued at the hearing that the juror was not truthful during the *voir dire* process and that if she had been truthful, "she would have been stricken for cause, and there's no way around that." *Id.* at 35. But Plaintiff responded by noting that "she said I didn't think I was discriminated and I didn't make a complaint for retaliation. In fact,

---

[14] The questions were directed to other *voir dire* questions I thought might pertain: whether 1) any juror had an opinion about people who make employment discrimination or retaliation complaints and 2) if there were any potential jurors who thought that because of their own beliefs about employment discrimination and retaliation, that they could not follow my instructions about the law. P.T.T. 11/2 (Doc. No. 188), at 11.

she never said anything that qualifies for discrimination under Third Circuit standard[s]. She said [she] was treated unfairly." *Id.* at 38.

The *McDonough* standard requires that a juror must have failed to honestly answer a material question during *voir dire*. *See* 464 U.S. at 556. The facts of *McDonough* are instructive here. In that action, a juror did not respond to a question that asked if the jurors, or someone in the juror's immediate family, had sustained a "severe injury" that resulted in disability or prolonged pain and suffering. *Id.* at 550. After a three-week trial, counsel for Greenwood filed a motion which stated they had information that a juror's son had been severely injured at some point, a fact that had not been revealed during *voir dire*. *Id.* While investigating the claims, attorney's found that the juror's son had indeed been injured when a truck tire exploded. *Id.* at 551. In explaining its rationale, the Supreme Court stated that

> [The juror] apparently believed that his son's broken leg sustained as a result of an exploding tire was not such an injury. In response to a similar question from petitioner's counsel, however, another juror related such a minor incident as the fact that his six-year-old son once caught his finger in a bike chain. Yet another juror failed to respond to the question posed to juror Payton, and only the subsequent questioning of petitioner's counsel brought out that her husband had been injured in a machinery accident.
>
> The varied responses to respondents' question on voir dire testify to the fact that jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges.

*See id.* at 555 (citations omitted).

I believe that is exactly what happened in this case. The juror was not dishonest. She did not believe she had been retaliated against, and did not make a material misstatement or omission that would otherwise invalidate the verdict. The Court in

*McDonough* noted that to invalidate a trial "because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *Id.* Listening to the juror's testimony, I did not hear anything that would trigger a concern regarding the verdict, nor anything that would make me question the fundamental fairness of the juror or trial itself. At the post-trial hearing the juror testified competently about what she heard and how she responded during *voir dire*, and she answered all questions honestly and forthrightly.[15] She insisted that she did not lie during the *voir dire*, and I believe her.

The City has failed to convince me that the juror failed to honestly answer a material question during *voir dire. See McDonough,* 464 U.S. at 556. I will deny all post-trial motions filed by the parties in this case, and enter judgment in favor of plaintiff.

BY THE COURT

  s/Richard A. Lloret
RICHARD A. LLORET
United States Magistrate Judge

---

[15] At one point, despite my caution to counsel and to the juror at the outset of the hearing that juror deliberations were off limits, the juror responded to a question by saying that "it was kind of obvious what had happened [to Plaintiff] in my opinion, and obviously, in the opinion of the rest of the jurors." *See* P.T.T. 11/2 (Doc. No. 188) at 31. The substance of this answer was not germane to the subject of the hearing and is not admissible, under Fed. R. Evid. 606(b). I have not considered the substance of the juror's testimony, nor have I considered plaintiff's report of the juror's account of deliberations, in response to defense counsel's questions immediately post-trial. *See* Doc. No. 175, at 5-6. Nevertheless, the juror's answer was typical of the juror's unaffected manner during the hearing. She did not appear to have an agenda and did not seem to be hiding anything.

38